U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

OCT 17 2013

CLERK, U.S. DISTRICT COURT
By _____
        Deputy

# United States District Court

NORTHERN _____ DISTRICT OF _____ TEXAS

UNITED STATES OF AMERICA

V.                                              **COMPLAINT**

                                        CASE NUMBER: 3-13-MJ- 706 .BH

Wayne Joseph Sweeney

    I, the undersigned complainant being duly sworn state the following is true and correct

to the best of my knowledge and belief.  On or about <u>September 13</u>, in <u>Dallas</u> County, in the

Northern District of Texas, defendant(s) did**,**

    Knowingly and intentionally combine, conspire, confederate and agree with other

persons known and unknown to possess with intent to distribute a Shedule I controlled

substance analogue,

in violation of Title <u>21</u>, United States Code, Section(s) <u>841(a)(1) and (b)(1)(B) and 846</u> .

    I further state that I am a <u>Special Agent with  Drug Enforcement Administration (DEA)</u>

and that this complaint is based on the following facts:

    See attached Affidavit of Special Agent Richard C. Gardner (DEA) which is
    incorporated and made a part hereof by reference.

Continued on the attached sheet and made a part hereof:   XX Yes     No

                        Signature of Complainant
                        Richard C. Gardner
                        Special Agent DEA

Sworn to before me and subscribed in my presence, on this _17th_ day of _October_, 2013, at
Dallas, Texas.

Irma C. Ramirez
<u>United States Magistrate Judge</u>                Signature of Judicial Officer
Name and Title of Judial Officer

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Richard C. Gardner, a Special Agent with the Drug Enforcement Administration (DEA), being duly sworn, depose and state as follows:

### Introduction

1.     I have been employed as a Special Agent with DEA for over 15 years, and I am assigned to the Dallas Field Division Office to conduct investigations of violations of federal drug statutes. I have conducted and participated in previous investigations of violations of the drug laws of the United States as well as money laundering, including violations of 21 U.S.C 841 (a)(1), 846, and 863; and 18 U.S.C 1956 and 1957.

2.     I am a "federal law enforcement officer" within the meaning of Section 2510(7) of Title 18, United States Code , and I am empowered by law to conduct criminal investigations and to make arrests for felony offenses.

3.     I have reason to believe that Wayne Sweeney has unlawfully committed a violation of 21 U.S.C. 841 (a)(1) and 846, that is conspiracy to distribute a Schedule 1 controlled substance analogue

4.     I obtained the following information from my own observations and information provided to me by other law enforcement officers involved in the investigation

### Synthetic Cannabinoids

5.     The Controlled Substances Act (CSA) contains a drug analogue[1] statute that classifies chemical analogues of existing scheduled drugs as a scheduled drug in the same category.   As a result of this statute and the prevalence of marijuana analogues, on March 1, 2011, DEA administratively placed five synthetic cannabinoids that were commonly found in synthetic marijuana products (JWH-018, JWH-073, JWH-200, CP-47,497, and Cannabicyclohexanol) in Schedule I of the CSA, which temporarily banned them and their analogues for one year pending DEA and Food and Drug Administration studies.   On February 29, 2012, DEA extended the Schedule I status of these substances for six months pending the passage of a final regulatory ruling.

6.     On July 9, 2012, the President signed into law the Synthetic Drug Abuse Prevention Act of 2012 (SDAPA). SDAPA amended the Controlled Substances Act by placing 26 substances in Schedule I. The list of legislatively scheduled controlled substances is found at 21 U.S.C. § 812(c) and the current list of scheduled substances is published at 21 C.F.R. § 1308. These initial schedules may be modified either by legislation or by rulemaking.  The legislation also creates a new definition for "cannabimimetic agents[2]," which creates criteria by which similar chemical compounds can be controlled.

---

[1] A controlled substance analogue is defined as a substance which: (1) has a chemical structural substantially similar to that of a controlled substance in Schedules I or II; (2) has a stimulant, depressant or hallucinogenic effect on the central nervous system that is substantially similar to or greater than that of a controlled substance in Schedules I or II; or (3) a particular person represents or intends to have a stimulant, depressant, or hallucinogenic effect substantially similar to or greater than that of a controlled substance in Schedules I or II [21 U.S.C. § 802(32)].
[2] "Cannabimimetic agents", as defined in SDAPA are controlled under Schedule I and unless specifically exempted or unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following substances, or which contains their salts, isomers, and salts of

**Affidavit in Support of Criminal Complaint for Arrest Warrant– Page 2 of 9**

7.     On December 21, 2012, DEA published a rule to establish drug codes for these substances, and to make technical and conforming amendments in accordance with SDAPA.

8.     DEA has also placed the following substances on a temporary listing of substances subject to emergency scheduling.  Any material, compound, mixture, or preparation which contains any quantity of the following substances:

    a.  4-methyl-N-methylcathinone (mephedrone);

    b.  3,4-methylenedioxy-N-methylcathinone (methylone); and

    c.  3,4-methylenedioxypyrovalerone (MDPV)

9.     On May 16, 2013, DEA made the synthetic cannabinoids known as:  UR-144, XLR11, and AKB48 Schedule I, illegal drugs under the Controlled Substances Act (CSA) for the next two years.  Part of the press release explained "These cannabinoids

---

isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation:

    a.  5-(1,1-dimethylheptyl)-2-[(1R,3S)-3-hydroxycyclohexyl]-phenol (CP-47,497);

    b.  5-(1,1-dimethyloctyl)-2-[(1R,3S)-3-hydroxycyclohexyl]-phenol (cannabicyclohexanol or CP-47,497 C8-homolog);

    c.  1-pentyl-3-(1-naphthoyl)indole (JWH-018 and AM678); 1-hexyl-3-(1-naphthoyl)indole (JWH-019);

    d.  1-[2-(4-morpholinyl)ethyl]-3-(1-naphthoyl)indole (JWH-200);

    e.  1-pentyl-3-(2-methoxyphenylacetyl)indole (JWH-250);

    f.  1-pentyl-3-[1-(4-methoxynaphthoyl)]indole (JWH-081);

    g.  1-pentyl-3-(4-methyl-1-naphthoyl)indole (JWH-122);

    h.  1-pentyl-3-(4-chloro-1-naphthoyl)indole (JWH-398);

    i.  1-(5-fluoropentyl)-3-(1-naphthoyl)indole (AM2201);

    j.  1-(5-fluoropentyl)-3-(2-iodobenzoyl)indole (AM694);

    k.  1-pentyl-3-[(4-methoxy)-benzoyl]indole (SR-19 and RCS-4);

    l.  1-cyclohexylethyl-3-(2-methoxyphenylacetyl)indole 7008 (SR-18 and RCS-8);

    m.  1-pentyl-3-(2-chlorophenylacetyl)indole (JWH-203) and

    n.  1-butyl-3-(1-naphthoyl)indole (JWH-073);

are often seen in so-called 'fake pot' products that are falsely marketed and sold as 'herbal incense' or 'potpourri' products on the Internet and by a variety of retail stores."

10.     In addition to the banned substances listed under the CSA, SDAPA, and DEA rules, 21 U.S.C. § 813 provides a "catch all" regarding controlled substance analogues.  According to § 813, if the controlled substance analogue is intended for human consumption, then the substance is to be treated as a controlled substance in Schedule I, for purposes of federal law.  The term "controlled substance analogue" is defined in Title 21 U.S.C. § 802(32)(A).

## Facts

On July 25, 2012, the Phoenix Field Division Office of DEA executed federal search warrants at Greenlight Distributing Inc. (Greenlight), in Phoenix, Arizona, along with the residence of its owner, Juan Mark Sayegh.  As a result, investigators located precursor chemicals, packaging materials, packaging equipment, and other items used in the manufacture and distribution of synthetic cannabinoids, synthetic cathinones (also known as "bath salts").  As the investigation continued into Greenlight Distribution and Mark Sayegh, investigators learned Greenlight Distribution was responsible for distributing synthetic cannabis and a synthetic cathinone. DEA Investigators conducted additional undercover purchases of "Mary Jane Potpourri" and "Mary Jane Reserves." These products once obtained were sent to the Southwest Regional Laboratory where they were tested. The analysis showed these items contained JWH-122 (1-Pentyl-3(4-methyl-1naphthoyl)indole). The DEA Drug and Chemical Evaluation Section's official position is that JWH-122 meets the criterion of an analogue of JWH-018 (1-Pentyl-3-(1naphthoyl)indole), a Schedule 1 controlled substance.

11.     Interviews were conducted with employees of the business, and based on the totality of the observations and findings of law enforcement personnel involved in these two search warrants, the only business activity being conducted by Greenlight involved the manufacturing and distributing of suspected synthetic cannabinoids and synthetic cathinones.  In reviewing the financial records obtained by DEA Phoenix during the course of their investigation, investigators determined that one of Greenlight's largest customers was an individual living in Dallas, Texas, named Wayne Joseph Sweeney operating a business called "Hostile Pipes" located at 11306 LBJ Freeway Ste-150, Dallas, TX 75238.  A review of Sweeney's Comerica bank account xxxxxx4103 revealed between September 2011 to July 2012, Sweeney had wired more than $500,000 to Greenlight

12.     On September 13, 2013, a DEA Confidential Source (CS) conducted an undercover buy at Hostile Pipes and purchased 11 packages of unlabeled suspected synthetic cannabinoids referred to as "Knock Out" by the sales clerk.  The packages were small, ziplock style baggies with no markings.  The suspected synthetic cannabinoids were submitted to the DEA South Central Laboratory for analysis.  Results of the laboratory testing revealed that the packages of contained PB-22 (1-Pentyl-1H-indole-3-carboxylic acid 8-quinolinyl) and 5F-PB-22 (1-5-Flouropentyl) -1H-indole-3-carboxylic acid 8-quinolinyl ester).

13.     Based upon interviews with sales persons at Hostile Pipes I learned that numerous customers had reported to the sales persons that they had smoked "KO" and

"Knock Out" brand synthetic cannabis product and that it was "good stuff", but that it also induced "withdrawal" symptoms.

14.    The chemicals PB-22 and 5F-PB-22 have recently been identified by the DEA Drug and Chemical Evaluation Section as emerging synthetic Cannabimimetic agents utilized by synthetic cannabis manufacturers. "Analysis has revealed that PB-22 is substantially similar in chemical structure to JWH-018 and meets the first criterion of the definition of a controlled substance analogue," which can be found at 21 U.S.C. § 802(32)(A)(i).   Based upon the available information, PB-22 is likely to have substantially similar pharmacological effects on the central nervous system to the schedule 1 substance JWH-018, which also meets the definition for a controlled substance analogue under 21 U.S.C. § 802(32)(A)(iii).   "Analysis has revealed that 5F-PB-22 is substantially similar in chemical to AM-2201 and meets the first criterion of the definition of a controlled substance analogue," which can be found at 21 U.S.C. § 802(32)(A)(i).   Based upon the available information, PB-22 "is likely to have substantially similar pharmacological effects on the central nervous system to the schedule 1 substance AM-2201," which also meets the definition for a controlled substance analogue under 21 U.S.C. § 802(32)(A)(iii).

15.    On October 16, 2013, agents from DEA Dallas Financial Strike Force Group executed a search warrant at Sweeney's business, Hostile Pipe located at 11306 LBJ Freeway, Dallas, TX. There agents seized approximately two kilograms of packaged "KO" or "Knock Out" brand synthetic cannabis, approximately one-half kilogram of synthetic cannabis, seven  kilograms of suspected synthetic cathinones ("Bath Salts")

**Affidavit in Support of Criminal Complaint for Arrest Warrant– Page 6 of 9**

which field tested positive for synthetic cathinones, a large amount of U.S. currency and numerous detailed drug ledgers and financial documents.

16.     During the course of the search warrant execution, agents interviewed the employees present at the business. Sales clerk Nadya Bernice Robledo-Contreas told agents that she had just started working at the store on October 9, 2013. She told agents that Wayne Sweeney was the owner of the business and that they sold "medical marijuana" and pipes to smoke it. When asked what she meant by "medical marijuana" she told agents that it was the "KO" ("Knock Out"). Robledo-Contreas told agents that from the time she started work at 9:45 a.m. until 6:00 p.m. when she clocked out that there was a constant stream of customers who came into the store to purchase synthetic cannabis. Robledo-Contreas stated that the overall majority of business sales were for synthetic cannabis. Robledo-Contreas told the agents that the price for "KO" was $21.60 for a small blue bag and $43.20 for a larger pink bag. Robledo-Contreas told agents that the "KO" was stocked under the counter of the main part of the store in large gallon size zip-lock bags that contained 100 blue and 100 pink baggies. Robledo-Contreas stated that a 100 count bag of each would be sold by 5:00 p.m. each day. Robledo-Contreas told agents that the customers really liked the "KO" brand of synthetic cannabis often telling her that it was "good stuff" with a "strong effect", though she (Robledo-Contreas) should not use the product as they suffered "withdrawals" after not using it for a while.

17.     Also interviewed was senior sales clerk Binduben Rasik Chauhan. Chauhan told agents that she had worked off and on for Sweeney at the Hostile Pipes since March 2011. Chauhan told agents that she was responsible for the operation of the store when

Sweeney was not present as he was often away. Chauhan stated that more than 90% of the business sales were for synthetic cannabis ("Knock Out" and the remaining 10% was divided between smoking accessories (pipes and bongs), e-cigarettes and regular cigarettes. Chauhan told agents that Sweeney brought the bulk synthetic cannabis to the store and the employees would weigh and package it in the pink and blue baggies in the rear of the store. Chauhan described to agents that the majority of the sales were in the form of currency which was kept in the cash registers until it was "too much" at which time it would be placed into nearby drop safes which she (Chauhan) would monitor and then place into a larger drop safe hidden inside an inner wall area. Chauhan stated that she did not have the combination to open the large drop safe and that only Sweeney had that responsibility. Chauhan did say that Sweeney would open the large drop safe, take the currency into his office where he would close the door. Chauhan explained the store was open 365 days per year and the store averaged at least 200 grams of "Knock Out" per day in sales. Chauhan explained the product sold for $21.60 per gram. Chauhan stated most of these sales were in the form of currency and she was responsible for depositing those funds into the Comerica Accounts controlled by Sweeney. Chauhan acknowledged that sales receipts from "Knock Out" would exceed $1,500,000.00 on an annual basis.

18.     Chauhan told agents that she had never smoked tobacco or any other product, but she did know why the customers purchased the synthetic cannabis: "To get high or something like that, I don't know." Chauhan told agents that customers often bought a pipe or papers to use with the synthetic cannabis. Chauhan told agents that

**Affidavit in Support of Criminal Complaint for Arrest Warrant– Page 8 of 9**

Sweeney resided in both the US and Mexico and often travelled between the two countries.

19.     Also recovered from Sweeney's records were FED-EX receipts from WSW Distributing located near Indianapolis, Indiana.   I am aware that the Indiana State police recently raided a synthetic cannabis manufacturing plant seizing in excess of 680 kilograms of synthetic cannabis being manufactured by WSW Distributing.

20.     Additional information obtained from the search warrant on October 16, 2013 revealed that Sweeney received a fax from Comerica Bank  on October 3, 2013 which confirmed the above referenced wire transfers to Greenlight Distributing and the numerous wire transfers by Sweeney of over $3,150,000.00 to the Mexico HSBC account of Sweeney.

### Conclusion

For the reasons state above, I believe that probable cause exists that Wayne Sweeney has committed a violation of 21U.S.C 841(a)(1) &(b)(1)(C) and 846, that is; conspiracy to distribute a Schedule I controlled substance analogue.

RICHARD C. GARDNER
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on the /7th day of October, 2013.

IRMA C. RAMIREZ
United States Magistrate Judge
Northern District of Texas

**Affidavit in Support of Criminal Complaint for Arrest Warrant– Page 9 of 9**